IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
January 27, 2004 Session

# STATE OF TENNESSEE v. GEORGE ARVIL VANCE & VINCENT VANCE

**Direct Appeal from the Criminal Court for Sullivan County**
**Nos. S43,074; S43,075     Phyllis H. Miller, Judge**

**No. E2003-00110-CCA-R3-CD**
**April 8, 2004**

A Sullivan County jury convicted the Defendants, George A. Vance and Vincent Vance, of aggravated gambling promotion for operating twenty-nine Free Spin machines in Bristol. The trial court sentenced Defendant George A. Vance to two years of supervised probation followed by four years of unsupervised probation and ordered him to make restitution in the amount of $130,521.00. The court sentenced Defendant Vincent Vance to one year of supervised probation followed by one year of unsupervised probation. On appeal, the Defendants contend that: (1) the evidence is insufficient to support their convictions because there was no evidence that they knowingly engaged in a gambling enterprise and the Free Spin machines were not principally designed as gambling devices; (2) the trial court abused its discretion by prohibiting the Defendants from introducing the testimony of a patent attorney concerning the issuance of a patent on the Free Spin machine; and (3) the trial court abused its discretion by prohibiting the Defendants from introducing evidence concerning comparable products, games and promotions similar to the play on the Free Spin machines. Finding no reversible error, we affirm the trial court's judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which GARY R. WADE, P.J., and ALAN E. GLENN, J., joined.

David C. Crockett and Lisa D. Rice, Elizabethton, Tennessee, for the appellants, George A. Vance and Vincent Vance.

Paul G. Summers, Attorney General and Reporter; Michael Moore, Solicitor General; David H. Findley, Assistant Attorney General; H. Greeley Wells, Jr., District Attorney General; and Robert Montgomery, Assistant District Attorney General, for the appellee, State of Tennessee.

## Opinion
## I.  Facts

This case involves the convictions of the Defendants for aggravated gambling promotion

after the Defendants were found to have operated twenty-nine Free Spin machines[1] in nine Bristol locations from August of 1998 to June of 1999. The following evidence was presented at the Defendants' trial. The parties stipulated that Vincent Vance is the son of George A. Vance and that they both were general partners in East Tennessee Vending and Amusement, LLC, between August of 1998 and June 10, 1999. The parties further stipulated that East Tennessee Vending and Amusement owned twenty-nine Free Spin vending machines and placed the machines in nine establishments in Bristol. Officers of the Bristol Tennessee Police Department seized the twenty-nine machines on June 10, 1999.

Thelma Trivette testified that she played a Free Spin machine at an establishment in Bristol by inserting money into the machine and receiving a sports collector's card for each dollar that she inserted. Trivette explained that she played the Free Spin machine and "got credits up to two hundred points and received ten dollars" from the cashier. She stated that the cashier "got the credits off of the machine," asked her to sign a document, paid her the ten dollars and then asked her for the baseball cards back. She reported that she had collected baseball cards in the past and that the cards she received from playing the Free Spin machine were not worth keeping. Trivette testified that a member of her family lost $500 playing the Free Spin machines, so she contacted the Bristol Tennessee Police Department concerning the machines in the spring of 1999.

Trivette stated that she agreed to work with the police department by playing the Free Spin machines located at various establishments in Bristol. She explained that the police department agreed to pay her $50 every time she won money on the machines, and she would use the money that police officers gave her to play on the machines. Trivette explained that she played the Free Spin machines and won money at five different establishments in Bristol between May 19, 1999, and June 7, 1999. She stated that the cashiers would clear out her credits on the machines after she redeemed her credits for cash. Trivette testified that she often returned the baseball cards to the cashiers when she redeemed her credits. She then demonstrated how the Free Spin machine worked by playing the machine in the courtroom. On cross-examination, Trivette testified that the Free Spin machines were located in public areas of the various establishments so anybody could play them. She stated that she never read the rules posted next to the machines, rather she just played the machines.

Blaine Wade, a captain with the Bristol Tennessee Police Department, testified that, pursuant to a search warrant, he and several officers seized the twenty-nine Free Spin machines from various establishments in Bristol on June 10, 1999. He reported that the machines contained money and sports cards in them when the police seized them. Captain Wade stated that officers found several hundred "promotional claim forms" that players of the machines would fill out and sign when "cashing out." He reported that officers also found two pads of "promotional game play vouchers" that players could fill out and send away for a free play on a Free Spin machine. He explained that the "promotional claim forms" and the vouchers for a free game contained the address of East

---

[1]The patent for the machine at issue in this case states that the name of the machine is "Collector Card/Fun Card Dispensing System with Promotional Free Spin, Free Draw Game Feature." We will refer to the machines as Free Spin machines in this opinion.

Tennessee Vending and Amusement Company. Captain Wade testified that officers also found several hundred sports cards that were used in the machines.

On cross-examination, Captain Wade stated that he could not recall talking with Defendant George A. Vance about the legality of the Free Spin machines before the police investigated the Defendants and their machines. He explained that Defendant George A. Vance discussed the machines with the district attorney's office during the police investigation of the Defendants. Captain Wade testified that the Free Spin machines dispensed a baseball card for every dollar inserted, and the machines were labeled as sports collector card machines at the various locations in Bristol. He stated that anyone could send away for a free game and then play the Free Spin machine for free, but he did not know of anybody who obtained a free game. Captain Wade testified that some of the machines had a gold sticker on the front of them that indicated that they were registered with the State of Tennessee and taxed as vending machines.

The Defendants sought to call Mark Patterson, a patent attorney with Waddey & Patterson in Nashville, to testify as an expert in patent law that the Free Spin machines were patented as "vending machines" and not "gaming machines." The State objected to the testimony as irrelevant, and the trial court sustained the objection, stating, "I find that it's irrelevant whether or not there is a patent. It's irrelevant what you call a machine. It's irrelevant how you describe a machine in an abstract on a patent . . . . It's how the machine works . . . and it's how it's used . . . ."

The Defendants then made an offer of proof of Patterson's testimony out of the presence of the jury. Patterson stated that he submitted a patent application on behalf of Keith heflin of World of Games, LLC, for the Free Spin machine. He testified that the name of the machine on the patent is "Collector Card/Fun Card Dispensing System with Promotional Free Spin, Free Draw Game Feature." Patterson explained that, after an initial rejection by the U.S. Patent and Trademark Office, Heflin received the patent for the Free Spin machine on April 10, 2001. On cross-examination, Patterson stated that the descriptive title given to an invention is created by the applicant, not by the patent office. He explained that "the patent simply describes that there is a game that you can choose to play after you purchase the card. The patent is not limited to any particular range of prizes that might be won as a consequence of playing that game." Patterson stated that the Free Spin patent requires that the cards dispensed have some value to them. He explained that the Free Spin machine was unique because it combined the purchase of a sports card with the opportunity to play a promotional game after the purchase. Patterson explained that Heflin wanted the Free Spin machine to be a legal non-gambling machine so he could get a patent on it and "have some monopoly rights in the market." Patterson stated that "[t]here are lots of gambling machines out there. [Heflin] couldn't get a patent on a gambling machine." He testified that he did not study the gambling laws of Tennessee to determine whether the Free Spin machine was legal under those laws.

Charles Thomas, a detective with the Bristol Tennessee Police Department, testified that he participated in seizing some of the Free Spin machines on June 10, 1999. Detective Thomas stated that he saw Defendant Vincent Vance performing maintenance on a Free Spin machine when he and other police officers arrived to seize the machines. He reported that he saw Defendant Vincent

Vance's Jeep Cherokee parked beside one of the establishments with several cases of baseball cards in the rear hatch, a box of receipt books in the back seat and a legal pad with names of establishments and dollar figures in the front passenger seat. Detective Thomas testified that he returned to the store, located Defendant Vincent Vance and told him "that I needed to get into his vehicle, that I believed that [the cards and business records were] evidence of a gambling enterprise that we were investigating, and that I was going to seize it." He stated that he then seized the cards, the receipt books and the legal pad. Detective Thomas stated that the receipt books contained a "Collection Report" page that had the establishment name on one line and Free Spin machine on another and was signed by Defendant Vincent Vance. He reported that, when the other officers were moving the machines, he saw several sports cards in the slots of the machines, on the floor, under the machines and behind the machines. Detective Thomas stated that he noticed that papers entitled, "Free Spin, Free Draw Official Rules," were taped to some of the machines, and a banner posted on the wall above the machines read "FREE DRAW," "FREE SPIN," "INSTANT CASH PRIZES," "COLLECTORS CARDS SOLD HERE" and "NO PURCHASE NECESSARY."

On cross-examination, Detective Thomas testified that he knew Defendant George A. Vance because he and Detective Thomas' father-in-law were friends. He explained that he talked with Defendant George A. Vance about how the machines worked, but Detective Thomas stated that he "expressed no opinion as to whether the machines are legal or not." The detective stated that he has not investigated whether the Free Spin machines were registered with the State or whether the machines had tax stamps on the front of them.

Ronnie Houser, the manager of Larry Neece's Southern Cards in Bristol, Virginia, testified as an expert in the field of the valuation of sports cards in the Bristol area. Houser stated that he examined the sports cards that police seized on June 10, 1999, in connection with the investigation of the Defendants. The State showed Houser boxes of sports cards seized from the Defendants, including boxes of 1989 Fleer baseball cards, 1987 Donruss baseball cards and 1990 Pro Set hockey cards, and Houser explained that individual cards were worth various amounts in June of 1999. He stated that most of the cards in the boxes were common cards that were worth about five to ten cents each. He said that good player cards, such as Ken Griffey, Jr., Mark McGuire or Barry Bonds, would be worth much more than the common cards. Houser explained that he sold common cards in his shop for no more than five cents each. Houser testified that, from the latter part of 1998 to the end of 1999, the sales at his store were approximately $16,000 to $18,000 per month.

On cross-examination, Houser testified that "wax packs" are factory sealed packs of cards containing varying numbers of cards within them, and the packs may contain more valuable cards as well as common cards. He explained that buying a "wax pack" differed from getting a card from a vending machine because "[w]hen you're filling up a vending machine, the person filling it up knows exactly what's in there." Houser stated that baseball card companies often have promotional games on the "wax packs" as an incentive to buy the packs.

Allen Phillips, a forensic examiner and crypt analyst for the Racketeering Records Analysis Unit of the Federal Bureau of Investigation ("FBI"), testified as an expert in the field of gambling

records analysis. Phillips stated that he examined the twenty-nine Free Spin machines seized by the police and determined that they all worked in the same manner. He explained that gambling devices have three distinct characteristics: (1) consideration; (2) chance; and (3) reward. Phillips testified that, as a racketeering records analyst for the FBI, "we look at various indications on the machine as to how it was designed and built and what features it contains" to determine whether it is a gambling device.

Phillips demonstrated how the Free Spin machine worked and testified that the machine uses an "eight-liner game" which is "a very common game" that is used across the country. He explained that "it's a slot machine type of game. . . . [T]here are eight lines on which you can form winning combinations of icons . . . ." Phillips stated that the Free Spin machine "shows your winning combinations and the amount of credits you would receive if you . . . lined up those combinations on the eight-liner game." He explained that a player would start playing by inserting a $1, $5, $10 or $20 bill. He stated that, once a player puts in the cash, the machine ejects one sports card for every dollar inserted and gives the player twenty credits for every dollar. Phillips reported that, after inserting the cash, "you would place the amount you want to wager on the next play of . . . the eight-liner game. And as you press the credits [button,] the wager amount meter . . . increases one for each time you press it." He stated that the minimum amount a player can bet on a Free Spin machine "is eight credits or forty cents" per game, while the maximum amount a player can bet per game is eighty credits or four dollars.

Phillips explained, "Once you've placed your eight bets as a minimum[,] all the lines are active so you have eight ways of forming a winning combination on this machine. In order to play it you press the start button." He stated that pressing the start button "will begin the reel spinning[,] and [in] approximately five seconds . . . the machine will come to a rest . . . with the icon displayed in each of the nine windows." He said that a computer program within the machine "generates a random number that correlates to one of the icons that are shown in each of these positions" and "produces a random outcome on your screen . . . ." Phillips explained that:

> Then . . . the computer will evaluate what icons are on the screen and determine if any of the lines are winning lines. If there's a winning line as we had here, a bar in each window going diagonally down from left to right, that was a winning combination. At the bottom we have a . . . message written on the screen "you win ten credits." So the pay off for a three bar combination is ten credits. And we had bet one credit on that line. So we got paid back ten credits for the one bet on that line, we lost on the other seven lines, so our total bet was eight credits and we won ten credits, so for the whole game we won two credits.

He stated that, after winning the credits, the player may take his or her winnings by hitting the "take" button, and then the machine may go into a "bonus mode," where the player can take "free spins that don't cost . . . any credits." He said that the player can take the credits that he or she wins during the bonus mode. Phillips explained that, once a player reaches two hundred credits or more, he or she may "cash out" and receive five cents for each credit.

Phillips testified that one of the characteristics of a gambling device is that a player can insert more money in the machine than is required to play a game or buy an item. He explained that this characteristic "is more a feature of a gambling device than an amusement device or a vending machine." He stated that the Free Spin machine is similar to a gambling device because a player can insert any amount of money and then wager his or her credits on multiple games.

Phillips testified that another characteristic of a gambling device is that the machine has a setting called a "[r]etention ratio, in which the operator of the device can set it for varying amounts of what the machine will pay out, what the amount of winnings probability will be." He stated that the Free Spin machine has red buttons inside the door on the left side that allow the operator access to different screens on the monitor to adjust the winning probability. He explained that the Free Spin machine was set to pay back fifty-five percent of the money put into the machine "over the long run of this machine." Phillips said that mechanisms for setting the winning probability on machines were "common to any slot machine in Las Vegas . . . ." He stated that, on a typical slot machine at a casino, the machine is set to pay back at least ninety-five percent. Phillips explained that the Free Spin machines allow the operator to set up the games however he or she wants, such as how many credits a player gets for every dollar, the minimum and maximum bets on each game and the retention ratio, which is common to the "eight-liner" games found throughout the country. He stated that setting the retention ratio "is a unique characteristic to a gambling device as opposed to an amusement device or a vending machine and there is no need for retention ratios on those types of machines."

Phillips testified that, similar to gambling devices, the Free Spin machines have "soft meters" as part of the computer program that track the amount of money that goes into, and out of, the machine. He explained that, when someone clears the credits from a machine, the Free Spin machine has an "out meter" that tracks the credits paid out to players. He stated that both gambling devices and Free Spin machines have "hard meters" that are used as a security check on the numbers showing on the "soft meters" of the game. The numbers taken from the "hard meters" should correspond with the numbers from the "soft meters." Phillips said that these types of meters are not usually found on amusement devices or vending machines.

Phillips testified that another characteristic of gambling devices is that they have the ability to pay out winnings to players. He explained that slot machines usually pay out by dispensing coins or tokens in trays at the bottoms of the machines. He stated that machines such as the Free Spin machines are not designed to pay out like slot machines. He said that these types of machines "are typically what we would call manufactured for the gray market, . . . so primarily they're trying not to display the characteristics of a gambling machine . . . . [T]hey devised a way to pay off the players without dumping money into a tray which would be obvious to any law enforcement agency." Phillips explained that the Free Spin machines have a feature where an operator of the machines can "clear off the credits." He stated that, when the credits are cleared off of the machine, the "hard meter" on the machine registers the number of credits paid out, and the credits displayed on the monitor of the machine goes to zero "so the next player cannot play those credits and be paid for the same credits." He explained that this "knock off" feature on the Free Spin machines "is just one

characteristic that is used in gambling devices as opposed to amusement devices which generally you'll not find . . . on an amusement device." Phillips testified that, with regard to the Free Spin machine, "you can see that you can place money in the machine, you can receive . . . credits for your wager. You can play the game and have winnings or los[ses,] and we're able to knock off those winnings and get paid for those winnings . . . ." He explained that those are the characteristics that he looks for in gambling devices.

Phillips testified that he also examined the business records that the Defendants kept for the Free Spin machines. He stated that the Defendants kept booklets of preprinted forms titled "Collection Reports" that contained the dates of collection, the location and number of the machine, the total amount of money in the machine, the amount paid out to players, the net amount to divide with the merchant, the merchant's share and the Defendants' share. He stated that most of the collection reports also contained a line to deduct a five percent tax from the total amount collected by the machine. He explained that the "route collector" would go around to all the locations that had the Free Spin machines and record how much money the machines took in and how much money was paid out to players by reading the soft and hard meters. Phillips stated that, after making the calculations, the "route collector" would reimburse the establishment for the amount of money it had to pay out on the machines. He explained that "the difference between what went into the machine and what's been paid out would then be split in some fashion with the establishment. In this case[,] it was consistently [a] fifty-fifty split between the establishment and the . . . vendor of the machines." Phillips testified that the Defendants' collection reports "are the same as we see in any gambling device operation throughout the country." He stated that all of the collection reports contained "a series of numbers written down[,] and these are both the hard meter numbers and the soft meter numbers . . . ." Phillips explained that these recorded numbers are necessary "to verify that the amount that went into the machine is correct[] and the amount of pay outs is what was actually paid off the machine. And these are all numbers that would be found on a normal collection sheet for a gambling device operation." He reported that the collection reports did not contain any evidence of accounting for costs of the sports cards that were placed into the machines.

Phillips testified that he also examined a legal pad that contained records of the Free Spin machines from different establishments. He stated that the legal pad contained handwritten notations of the hard and soft meters for each of the six machines at one location for December of 1998, the total amount of money taken in and paid out by the machines at that location for 1998, and the profit for those machines for 1998. He explained that these types of records "are things we would typically see in . . . gambling device operations records." Phillips testified that the legal pad also contained records of the Free Spin machines at the other locations and calculations of how much money went in and out of the machines. He stated that, according to the collection reports and the records kept on the legal pad, the twenty-nine Free Spin machines collected a total of $333,684.85 in 1998, and he calculated the gross profit of the machines in 1998 to be $129,217.60. Phillips testified that the machines collected a total of $533,092.00 from January to May of 1999. He explained that the Defendants' business records for the Free Spin machines "are very similar to most gambling operations. The fact that accounting records are kept that only reflect the ins and outs on the machine is consistent with gambling device machines as opposed to . . . vending businesses . . . ."

-7-

Phillips stated that businesses that manage vending machines will have records that reflect a deduction from the gross sales for the cost of the goods that were sold, but on the Defendants' business records, "there's no indication that there is any expense for what they're selling, [rather] the only expense is the pay outs on the machine."

On cross-examination, Phillips testified that it was common for operators to mislabel a gambling device and that the banners posted above the Free Spin machines would have had a "minimal effect" on his opinion as to whether those machines were gambling devices. He stated that he examined the rules posted next to the Free Spin machines and determined that the Defendants or the operators of the machines at the various establishments did not enforce the rule that stated that "the promotional points received from the purchase of the . . . card or from a free play voucher have no cash value and may not be redeemed." He stated that the Free Spin machines could not distinguish between credits obtained initially by placing money into the machine or credits obtained by wagering credits on the eight-liner game. Phillips acknowledged that many products offer sweepstakes games that rely on chance, though during his time with the Racketeering Records Analysis Unit of the FBI, the FBI had not investigated those games. He stated that the Free Spin machines differ from sweepstakes games because the Free Spin machines are gambling devices. He explained that "[i]f it's a mechanical device that allows you to risk consideration and[,] through the play of a game of chance[,] receive a reward[,] it . . . would fall under our definition of a gambling device." The Defendants' counsel attempted to cross-examine Phillips about specific sweepstakes games, but the trial court limited cross-examination to asking Phillips about the characteristics of those sweepstakes games, not the specific games themselves.

On cross-examination, Phillips testified that if someone sent off for a free promotional game and then played that free game on the Free Spin machine, "then in that instance they would not have the characteristic of consideration, so . . . for that play of the game it would not qualify as a gambling device." He stated that he did not check to see whether the Defendants paid federal income tax or Tennessee vending machine taxes on the profits from the machines. He explained that he did not know whether paying taxes on the profits from the machines "would bear on whether they were gambling or not . . . ." When asked whether the Defendants' machines would be considered gambling devices if they vended bottles of soft drinks instead of baseball cards, Phillips testified, "If you've got credits that could be cashed out for the equivalent value of what you put into the machine and you were allowed to wager with those credits[,] I would say, yes, it would be a gambling device."

The Defendants then called Dwayne Keith Heflin, chief executive officer of World of Games, LLC, to testify. Heflin testified that he invented the Free Spin machine and that the machine combined a vending machine with a video game. He explained, "The combination was derived in order to sell . . . collectors [cards], and to offer a promotional game of chance to encourage consumers to purchase the card through this machine versus going to a ball card shop or other vending machines." He stated that, unlike gambling devices, the Free Spin machines were designed so that if the supply of cards in the machine is exhausted, then the machine will not work. Heflin explained that, unlike a gambling device, the Free Spin machine sells sports cards for a dollar each.

He stated that, for every dollar inserted into the machine, one and a half percent goes to the State for gross revenue sales tax, which "is another characteristic you do not see in a gambling device." Heflin explained that the Free Spin machines have State vending stamps affixed to the front of them, unlike gambling devices. He testified that he received eight or nine requests for free games during the time the Defendants operated the machines and that this option of allowing players to send away for free games "is not a characteristic of a gambling device." Heflin testified that every free game voucher used to play a free game on the Free Spin machine is recorded by the machine, "[s]o, there's accountability in this machine that you wouldn't see in a gambling device." He stated that the video game on the Free Spin machines was similar to "Cherry Masters" or "Cherry Pickers" video slot machine games.

Heflin testified that he entered into a contract with the Defendants when they purchased the machines that set forth certain rules of operation of the machines that had to be followed. He stated that if they violated those rules, the Defendants "could lose their distributorship, their investment, and [they would have to give] the property back to Worlds of Games." Heflin testified that he or his employees checked to see if the Defendants followed the rules of operation, which included displaying the rules of the game, the free game vouchers and the banners for the machines, and the Defendants complied with the rules. He explained that the Defendants had to purchase all of the sports cards for the machines from World of Games, because "[o]ur long term income from this machine being in operation is that we sell the [Defendants] and other people like them the stock that goes in the machines." He said that baseball cards were the most popular type of sports cards in the Bristol area. He stated that the Defendants were required to pay all of the sales taxes on the baseball cards they sold in the machines. Heflin reported that the Defendants paid three to three and a half cents per card for the sports cards they put into the machines. He stated that the Defendants paid $2,495.00 plus sales tax for each machine.

Heflin testified that the Free Spin machines were not gambling devices because "you are never required to risk anything of value, therefore, you are never wagering anything on chance." He explained that credits obtained on the machines by inserting money have no cash value, rather the credits have to be played on the machines in order for the players to cash in their credits. He stated that players may cash in any credits above the number of credits they initially received when they inserted their money. He said that the rules for the Free Spin machines did not require players to reach two hundred credits in order to cash in their credits.

On cross-examination, Heflin testified that he charged the Defendants $25,000.00 as a distribution fee to place the Free Spin machines in the Sullivan County area. He stated that he paid from half a cent to a cent and a half for each baseball card that he distributed to the Defendants, and he charged the Defendants from two to three and a half cents for the cards. He explained that some of the cards placed in the machines may be worth significantly more than the common cards that were placed into the machines. He stated that his company set the retention ratio on the Free Spin machines at fifty-five percent, and the Defendants, through their contract with Worlds of Games, agreed not to change anything on the machines. Heflin admitted that the machines could not differentiate between the initial credits awarded by inserting money into the machines and credits

won as a result of betting those initial credits. He acknowledged that his company owned and operated some Free Spin machines in Bedford County.

Following presentation of evidence and closing arguments, the jury convicted the Defendants of aggravated gambling promotion. The trial court sentenced Defendant George A. Vance to two years of supervised probation followed by four years of unsupervised probation and ordered him to make restitution to the Tennessee Department of Revenue in the amount of $130,521.00. The trial court sentenced Defendant Vincent Vance to one year of supervised probation followed by one year of unsupervised probation. The Defendants now appeal.

## II. Analysis

On appeal, the Defendants contend that: (1) the evidence is insufficient to support their convictions because there was no evidence that they knowingly engaged in a gambling enterprise and the Free Spin machines were not principally designed as gambling devices; (2) the trial court abused its discretion by prohibiting the Defendants from introducing the testimony of a patent attorney concerning the issuance of a patent on the Free Spin machine; and (3) the trial court abused its discretion by prohibiting the Defendants from introducing evidence concerning comparable products, games and promotions similar to the play on the Free Spin machines.

## A. Sufficiency of the Evidence

The Defendants contend that the evidence presented at trial is insufficient to support their convictions. When an accused challenges the sufficiency of the evidence, an appellate court's standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); Jackson v. Virginia, 443 U.S. 307, 324 (1979); State v. Smith, 24 S.W.3d 274, 278 (Tenn. 2000). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999).

In determining the sufficiency of the evidence, this Court should not re-weigh or re-evaluate the evidence. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. State v. Buggs, 995 S.W.2d 102, 105 (Tenn. 1999); Liakas v. State, 286 S.W.2d 856, 859 (Tenn. 1956). Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. Liakas, 286 S.W.2d at 859. This Court must afford the State the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. Id.

The Defendants were convicted of aggravated gambling promotion. A person commits aggravated gambling promotion "who knowingly invests in, finances, owns, controls, supervises, manages or participates in a gambling enterprise." Tenn. Code Ann. § 39-17-504(a) (1997). Gambling enterprise means "two (2) or more persons regularly engaged in gambling promotion as defined in § 39-17-503." Tenn. Code Ann. § 39-17-504(b). Tennessee Code Annotated section 39-17-503(a) (1997) defines gambling promotion as follows:

> A person commits an offense who knowingly induces or aids another to engage in gambling, and:
> (1) Intends to derive or derives an economic benefit other than personal winnings from the gambling; or
> (2) Participates in the gambling and has, other than by virtue of skill or luck, a lesser risk of losing or greater chance of winning than one (1) or more of the other participants.

Knowingly "refers to a person who acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that circumstances exist." Tenn. Code Ann. § 39-11-106(a)(20) (1997). A person "acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." Tenn. Code Ann. § 39-11-106(a)(20). Gambling "means risking anything of value for a profit whose return is to any degree contingent on chance, but does not include a lawful business transaction." Tenn. Code Ann. § 39-17-501(1) (1997). A lawful business transaction "includes any futures or commodities trading." Tenn. Code Ann. § 39-17-501(4). Profit "means anything of value in addition to the gambling bet." Tenn. Code Ann. § 39-17-501(6). A gambling device "means anything designed for use in gambling, intended for use in gambling, or used for gambling." Tenn. Code Ann. § 39-17-501(3).

The Tennessee Supreme Court upheld the constitutionality of Tennessee Code Annotated sections 39-17-501 and 39-17-505 (1989) in State v. Burkhart, 58 S.W.3d 694 (Tenn. 2001). In Burkhart, the defendant was charged with possession of a gambling device in violation of Tennessee Code Annotated section 39-17-505 after a police officer found video slot machines in the defendant's bar. Burkhart, 58 S.W.3d at 696. While upholding the constitutionality of the statutes, the Court made the following observations:

> A gambling device is defined as "anything designed for use in gambling, intended for use in gambling, or used for gambling." Tenn. Code Ann. § 39-17-501. This definition is sufficiently clear to provide notice that a slot machine is a gambling device.
>
> A slot machine is designed for use in gambling and normally intended for use in gambling. The outcome of a game on Burkhart's machines is contingent upon chance. Skill is not required to play the slot machines. The confiscated machines were equipped with knock-off switches and retention meters. The number of games

-11-

or credits won by the player could be recorded by the machines. The knock-off switch on the machines allowed credits won to be removed from the screen but remain recorded within the machine. Unlike standard arcade games, the settings on the slot machines could be changed to manipulate the odds of winning. The characteristics of the machines demonstrate their design for use in gambling.

Id. at 698.

In Painter v. State, 45 S.W.2d 46, 46 (Tenn. 1932), the defendant was convicted for unlawfully keeping and exhibiting a gaming device in violation of Shannon's Code section 6805, which provided as follows: "If any person encourage or promote, aid or assist, the playing at any game, or the making of any bet or wager, for money or other valuable thing, or keep or exhibit any gaming table or device for gaming, he is also guilty of a misdemeanor." The defendant owned and operated a mint vending machine, "which, in addition to delivering a package of mints for the customer's coin, may emit . . . checks or chips" that could be used to play a baseball game attached to the vending machine. Painter, 45 S.W.2d at 46. The number of chips the customer would receive for each coin deposited was "controlled by the interior mechanism of the machine, and varies from two to twenty. . . . The [chips] . . . have no intrinsic value. They are delivered to [the customer] for the sole purpose of enabling him to operate the machine in playing the game of baseball as described." Id.

The Court noted that the chips gave the customer "the right to operate the machine for whatever amusement the playing of the game will afford. It is a right not extended uniformly to all customers of the store . . . but only to those who purchase mints, and to them only according to chance and contingent fortune." Id. The Court further noted that many customers would place more money into the machine "in the hope of enabling himself [or herself] to continue the contest, with the package of mints a minor consideration." Id. at 47. The Court explained that the chips that were randomly awarded by the vending machine were "things of value" under the gambling statutes because the chips allowed the customer to continue the operation of the machine for amusement. The Court held that the mint vending machine with the attached baseball game was a gambling device because "[t]he fundamental and underlying principle of the offer made by the device to the customer is one of chance and hazard, and fails within the letter and spirit of the statute." Id. at 47.

In a similar case, the Tennessee Supreme Court, relying upon its decision in Painter, held that a mint vending machine was a gambling device because the player of the machine was awarded, in addition to a package of mints, a varying number of free plays on the machine for every nickel the player inserted. Heartley v. State, 157 S.W.2d 1, 3 (Tenn. 1941). The Court explained that:

"In general, . . . a slot machine which, in return for a coin deposited therein, dispenses merchandise of the value of such coin, accompanied at occasional and uncertain intervals by a varying amount of money, trade checks, or coupons, or more broadly, one which provides an element of chance, is a gambling device."

> "According to the generally prevailing opinion, where the return to the player is thus dependent on an element of chance, a slot machine is a gambling device, even though the player is assured of his money's worth of some commodity and, hence, cannot lose. Also, according to the great weight of authority a slot machine is not rendered innocuous by the fact that it indicates in advance of each deposit exactly what it will dispense, since it is considered that in such instances, the player gambles not on the immediate return for the coin he deposits, but on the hope or chance that the indicator will show a profit on his [or her] next play. . . ."

> "Furthermore, a machine which returns merchandise of the value of the coin played therein and, in addition, a chance of receiving a varying amount of checks which may be used to play the machine for amusement only is a gambling device, the right to continue the operation of the machine for amusement being a thing of value within statutes directed against gaming. . . ."

Id. at 2-3 (quoting 24 Am. Jur. *Gambling and Prize Contests* § 35 (1941)). The Court also noted that "[i]f the machine in question were limited to the delivery of a package of mints, it would have no element of chance connected with it. It is this added inducement of receiving something for nothing that arouses the gambling instinct." Id. at 3. The Court concluded that a "'thing of value' to be the subject of gambling may be any 'thing' affording the necessary lure to indulge the gambling instinct. Any incitement which would impel the player to stake his money on a chance of winning would produce the evil consequences at which the enactment is aimed." Id. (quoting State v. Mint Vending Mach., 154 A. 224, 226 (N.H. 1931)).

On appeal, the Defendants contend that the evidence is insufficient to support their convictions because the "proof presented at trial established that the [Free Spin] machine is not principally designed for gambling" and the operation of the Free Spin machines in Bristol establishments was a lawful business transaction. The Defendants further contend that there was no evidence that they knowingly engaged in a gambling enterprise. We respectfully disagree with the Defendants' assertions.

The Defendants stipulated that they owned and operated twenty-nine Free Spin machines in nine Bristol establishments between August of 1998 and June 10, 1999. There is no dispute that the Defendants financed and supervised the operation of these machines, which included stocking the machines with sports cards, collecting money from the machines and recording the amount of money that went into and out of the machines. The issue we must decide is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found beyond a reasonable doubt that the operation of the Free Spin machines constituted gambling. If so, then sufficient evidence exists in the record to support the Defendants' convictions of aggravated gambling promotion.

The evidence showed that the Free Spin machines worked in the following way: A player activates the Free Spin machine by inserting a $1, $5, $10 or $20 bill, and the machine dispenses one

-13-

baseball card for every dollar inserted and gives the player twenty credits for every dollar to wager on a video slot-machine game. After a player wagers credits and hits the "play" button, the Free Spin machine randomly determines whether the player has won additional credits or lost credits. The player may wager from eight credits to sixty-four credits on each video slot-machine game, and once the player reaches at least two hundred credits on the machine, he or she may go to the cashier of the business and cash in the credits at five cents a credit. A player may send away for a free play voucher and play the Free Spin machine for free, though the player will not receive a sports card for the free play. Heflin testified that a player may only cash in the credits that were above the number of credits that the player initially obtained by inserting the money; however, the machines could not make that distinction, and the cashiers paid players cash for all the credits on the machine, regardless of the initial deposit.

The evidence showed that the Free Spin machine had the characteristics of a gambling device because it allowed the player to insert money for five cent credits, to wager those credits on a game of chance and to cash in those credits once the player accumulated two hundred credits. Moreover, the Free Spin machines were equipped with "soft" and "hard" meters to track the amount of money placed into the machine and the amount paid out to players, and the machines also had a device to modify the winning percentage on the machines, similar to gambling devices. The machines were similar to gambling devices because they had a knock-off feature so the cashiers at the establishments could clear out the credits on the machines after paying players for their credits. Finally, the Defendants' business records of the Free Spin machines were similar to gambling device operations records because they only recorded the amount of money that went into and out of the machines.

After examining the evidence in the light most favorable to the prosecution, we conclude that the Free Spin machines clearly qualify as gambling devices because the machines were "used for gambling." Tenn. Code Ann. § 39-17-501(3). The evidence showed that the operation of the Free Spin machines fell within the definition of "gambling" because the machines were used to risk credits worth five cents apiece for a profit whose return was contingent on chance. Tenn. Code Ann. § 39-17-501(1). The fact that the Free Spin machines dispensed a sports card for every dollar inserted does not change the gambling characteristics of the machines. As the Tennessee Supreme Court held in Heartley, "the right to continue the operation of the machine for amusement after receiving a package of mints is a thing of value within statutes against gaming." Heartley, 157 S.W.2d at 3; see Painter, 45 S.W.2d at 47-48. In this case, not only may a player continue playing the eight-liner game by wagering his credits after receiving a sports card, but the player may cash in those credits after reaching the two-hundred-credit threshold. Although Heflin testified that the credits awarded by inserting money were "promotional" and had "no cash value," players wagered these credits on the eight-liner games and cashed in their credits at five cents apiece, so the credits were "things of value" under the gambling statute. We note that courts in other jurisdictions have also held that the Free Spin machines are gambling devices. See, e.g., MDS Inv., LLC v. State, 65 P.3d 197, 205 (Id. 2003); Jack Eiser Sales Co. v. Wilson, 752 N.E.2d 225, 229 (Ind. Ct. App. 2001).

Accordingly, after considering the evidence in the light most favorable to the prosecution,

we conclude that a rational trier of fact could have found beyond a reasonable doubt that the operation of the Free Spin machines constituted gambling. We further conclude that the evidence showed that the Defendants committed gambling promotion because they knowingly induced or aided people to engage in gambling through their promotion of the Free Spin machines in nine Bristol establishments, and they derived an economic benefit from the operation of those machines. Tenn. Code Ann. § 39-17-503(a). The Defendants assert that they did not knowingly commit aggravated gambling promotion because they believed that the Free Spin machines were legal under the gambling statutes and they displayed the machines "in the main, public areas" of the nine establishments. However, "[t]he fact that a person honestly believes that he has a right to do what the law declares to be illegal will not affect the criminality of the act." Hunter v. State, 12 S.W.2d 361, 362 (Tenn. 1928). The Defendants knowingly owned and operated the Free Spin machines in nine Bristol establishments for profit, thereby inducing customers to gamble, between August of 1998 and June 10, 1999. Therefore, after viewing the evidence in the light most favorable to the prosecution, we conclude that a rational trier of fact could have found beyond a reasonable doubt that the Defendants committed aggravated gambling promotion.

## B. Evidentiary Rulings

The Defendants next contend that the trial court abused its discretion on two occasions: (1) by prohibiting the Defendants from introducing the testimony of a patent attorney concerning the issuance of a patent on the Free Spin machine; and (2) by prohibiting the Defendants from introducing evidence concerning comparable products, games and promotions similar to the play on the Free Spin machines. The State argues that the trial court did not abuse its discretion because both the testimony regarding the patent on the machines and the testimony about comparable products and games were irrelevant and would have confused the jury. We agree with the State.

In Tennessee, admissibility of evidence is within the sound discretion of the trial judge. State v. Saylor, 117 S.W.3d 239, 247 (Tenn. 2003). The determination of whether proffered evidence is relevant in accordance with Tennessee Rule of Evidence 402 is left to the sound discretion of the trial judge, as is the determination of whether the probative value of evidence is substantially outweighed by the possibility of prejudice pursuant to Tennessee Rule of Evidence 403. State v. Kennedy, 7 S.W.3d 58, 68 (Tenn. Crim. App. 1999) (citing State v. Forbes, 918 S.W.2d 431, 449 (Tenn. Crim. App. 1995)); State v. Burlison, 868 S.W.2d 713, 720-21 (Tenn. Crim. App. 1993). We will only disturb an evidentiary ruling on appeal when it appears that the trial judge arbitrarily exercised his or her discretion. State v. Baker, 785 S.W.2d 132, 134 (Tenn. Crim. App. 1989).

Initial questions of admissibility of evidence are governed by Tennessee Rules of Evidence 401 and 403. These rules require that the trial court must first determine whether the proffered evidence is relevant. Pursuant to Rule 401, evidence is deemed relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable than it would be without the evidence." See Forbes, 918 S.W.2d at 449. In other words, "evidence is relevant if it helps the trier of fact resolve an issue of fact." Neil P. Cohen, et al., *Tennessee Law of Evidence* § 4.01[4], at 4-8 (4th ed. 2000). If the trial court finds that the proffered

evidence is relevant, it then weighs the probative value of that evidence against the risk that the evidence will unfairly prejudice the trial. State v. James, 81 S.W.3d 751, 757 (Tenn. 2002). If the court finds that the probative value is substantially outweighed by its prejudicial effect, the evidence may be excluded. Tenn. R. Evid. 403. "'Excluding relevant evidence under this rule is an extraordinary remedy that should be used sparingly and persons seeking to exclude otherwise admissible and relevant evidence have a significant burden of persuasion.'" James, 81 S.W.3d at 757-58 (quoting White v. Vanderbilt Univ., 21 S.W.3d 215, 227 (Tenn. Ct. App. 1999)).

### 1. Patent Attorney Testimony

After thoroughly reviewing the record, we conclude that the trial court did not abuse its discretion by prohibiting the Defendants from introducing the testimony of a patent attorney concerning the issuance of a patent on the Free Spin machine. The Defendants sought to call Mark Patterson, a patent attorney and an expert in patent law, to testify that the Free Spin machines were patented as "vending machines" and not "gaming machines." Among other things, Patterson would have testified that the name of the machine on the patent was "Collector Card/Fun Card Dispensing System with Promotional Free Spin, Free Draw Game Feature." The State objected to the testimony as irrelevant, and the trial court sustained the objection, stating, "I find that it's irrelevant whether or not there is a patent. It's irrelevant what you call a machine. It's irrelevant how you describe a machine in an abstract on a patent . . . . It's how the machine works . . . and it's how it's used . . . ."

We agree with the trial court's finding that Patterson's testimony about the patent on the Free Spin machine was irrelevant to the jury's determination of whether the Defendants were guilty of aggravated gambling promotion. The testimony about the patent on the machine would not have helped the trier of fact resolve an issue of fact because the name of the machine on the patent has nothing to do with how the machine works. Under Tennessee Code Annotated section 39-17-501, the determination of whether a machine is a gambling device depends upon the machine's operation and use, not the machine's name. Therefore, the fact that the name of the machine on the patent is "Collector Card/Fun Card Dispensing System with Promotional Free Spin, Free Draw Game Feature" is simply irrelevant to whether the machines were used to gamble and whether the Defendants were guilty of aggravated gambling promotion. Accordingly, we conclude that the trial court did not abuse its discretion by excluding this evidence.

### 2. Comparable Products and Games

We likewise conclude that the trial court did not abuse its discretion by prohibiting the Defendants from introducing evidence concerning comparable products, games and promotions similar to the play on the Free Spin machines. The Defendants' counsel attempted to cross-examine Phillips about specific sweepstakes games from McDonald's and Bob Evans, but the trial court limited cross-examination to asking Phillips about the characteristics of those sweepstakes games, not the specific games themselves. The Defendants' counsel also requested that he be allowed to ask Heflin about comparable games and sweepstakes. The trial court found that such testimony was

irrelevant because there were no court cases that declared those games legal, and "[i]f it is relevant, I find it is . . . too confusing and too prejudicial to allow it to be introduced."

Testimony about specific sweepstakes games and promotions was irrelevant to the jury's determination of whether the Defendants were guilty of aggravated gambling promotion. Such testimony would not have had any tendency to make the existence of any fact that is of consequence to the determination of the action more probable than it would be without the testimony. Moreover, testimony about specific promotional games would have confused the jury, because the Defendants were on trial for aggravated gambling promotion in connection with operating the Free Spin machines, not for running other types of promotional games. The trial court allowed the Defendants' counsel to ask questions about the characteristics of different sweepstakes games, but it did not allow counsel to ask about specific games. After thoroughly reviewing the record, we conclude that the trial court did not abuse its discretion by excluding this evidence.

### III. Conclusion

In accordance with the foregoing authorities and reasoning, we AFFIRM the trial court's judgments.

_____
ROBERT W. WEDEMEYER, JUDGE